The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



/s/ Russ Kendig

Russ Kendig
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) CASE NO. 07-61471 |
| | ) |
| | ) CHAPTER 7 |
| DARLENE K. BAUM, | ) |
| | ) JUDGE RUSS KENDIG |
| Debtor. | ) |
| | ) **MEMORANDUM OF OPINION ON** |
| | ) **MOTION TO DISMISS** |

This matter is before the Court on the Motion to Dismiss Case for Abuse filed by the U.S. Trustee ("UST") on September 10, 2007. Debtor filed an objection on September 20, 2007. The court held a hearing on the motion on November 20, 2007, at which the Court took the matter under advisement and gave the parties until November 27, 2007 to file additional briefs if desired. Neither party filed an additional brief.

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O). The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor began to gamble online in June or July of 2006, at first for personal entertainment (i.e., with no money involved), then for increasing monetary stakes, financing the transactions

with payments from credit cards, which the online gambling sites accepted. The spiral continued for three or four months, during which online gambling began to consume Debtor's life: she would visit gambling sites in the morning before going to work, at lunch (coming home from work), and at home in the evenings. Although all of the gambling was online, it came to a point at which Debtor realized it was materially affecting her life, financially and non-financially.

In November of 2006, Debtor ceased gambling and began seeing a counselor. At some point during treatment, she canceled her home internet service and now checks her e-mails only at work. However, by the time she began seeing her counselor, she had already amassed substantial balances on the credit cards she had dedicated to gambling. There is still some ambiguity following the hearing regarding precisely which debts listed on Debtor's Schedule F are for online gambling, but Debtor stated on the record that the her gambling losses during this comparably short period of time totaled approximately $40,000.00. (This figure is also reflected in Item #8 of her Statement of Financial Affairs, filed with her petition.) At this time, she also began speaking with a family friend who was also an attorney–albeit not a bankruptcy attorney–about the bills she had accumulated. For some months thereafter, until approximately January 2007, she investigated approximately five debt consolidation services, but found that even the consolidated loan payments that would have been offered would have been approximately $500 a month, beyond her means, so she never signed up for any such service. In January or February, a representative of one of these companies told her that if she could not afford the payments and terms offered, there was little that they could do for her and that she might want to consider filing bankruptcy. In February of 2007, she contacted her current counsel and shortly thereafter filed her Chapter 7 petition.

On September 10, 2007, the UST filed a motion to dismiss the case for abuse of Chapter 7. In its motion and at the hearing on November 20, 2007, the UST argued that Debtor's attempt to discharge her obligations to her creditors via Chapter 7 amounted to either bad faith or a dishonest relationship with her creditors, either of which would warrant dismissal for abuse under 11 U.S.C. § 707(b). UST cites as evidence the fact that this case was not filed as the result of sudden illness, calamity, disability, or unemployment. Debtor's gambling debts were the decisive factor that pushed her to seek bankruptcy protection. UST argues that Debtor incurred debts knowing they were beyond her ability to repay, intent on keeping the winnings if she won while foisting the losses off on her creditors if she lost. Debtor argues that she did in fact intend to pay back her creditors at the time she incurred her debts, and even attempted to do so when the bills arrived and were much steeper than anticipated; her efforts simply failed. Therefore, she argues, her filing was not in bad faith and her relationship with her creditors was not dishonest.

## LEGAL ANALYSIS

### I. Introduction

For the reasons discussed in Part II, infra, the Court finds that the U.S. Trustee has failed

2

to carry its burden of proving that Debtor filed her petition in bad faith under 11 U.S.C. §707(c)(3)(A), or that the totality of the circumstances of the debtor's financial situation demonstrates abuse under 11 U.S.C. § 707(c)(3)(B) and In re Krohn, 886 F.2d 123 (6th Cir. 1989).

In addition, while this issue was not litigated at the hearing, the Court also has strong doubts regarding the undeveloped issue of whether the underlying gambling debts were enforceable in the first place, and the equally unexplored subsequent issue of whether unenforceable debts could ever form the basis of a complaint to dismiss a bankruptcy case for abuse. The Court discusses this in Part III, infra.

## II. Bad Faith and/or Dishonesty With Creditors

### A. Bad Faith

The Code provides that the court may dismiss an individual's case under Chapter 7 if the debtor's debts are primarily consumer debts and the court finds that the granting of relief would be an abuse of the provisions of Chapter 7. 11 U.S.C. § 707(b)(1). It is not disputed that the debtor is an individual or that her debts are primarily consumer debts. The UST has not alleged that the presumption of abuse under 11 U.S.C. § 707(b)(2) arises. However, even in the absence of such a presumption, a bankruptcy court may still find that the granting of relief would be an abuse of the provisions of Chapter 7. In the event the presumption does not arise or is rebutted, one factor that the Code explicitly directs a bankruptcy court to consider in determining if relief would nonetheless be an abuse of Chapter 7 is whether the debtor filed her petition in bad faith. 11 U.S.C. § 707(b)(3)(A). The Sixth Circuit has not specifically ruled on whether a subjective or objective standard is to be used for evaluating "bad faith" in the context of § 707(b)(3)(A) motions, and the Sixth Circuit has actually suggested that both objective and subjective inquiries are appropriate. In Industrial Ins. Svcs., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1128 (6th Cir. 1991), the court adopted the broad language of In re Bingham, 68 B.R. 933 (Bankr. M.D. Pa. 1987), holding that "[t]he facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases." Id. at 935. The explicitly nonexclusive sampling of such factors enumerated in Bingham includes both objective and subjective elements:

    (a) frivolous purpose, absent any economic reality;
    (b) lack of an honest and genuine desire to use the statutory process to effect a plan of reorganization;
    (c) use of a bankruptcy as a device to further some sinister or unworthy purpose;
    (d) abuse of the judicial process to delay creditors or escape the day of reckoning in another court;
    (e) lack of real debt, creditors, assets in an ongoing business;
    (f) lack of reasonable probability of successful reorganization.

Id. (internal citation omitted). The first four of these factors are subjective; the latter two, objective.

The Zick court itself was addressing only the questions of (1) whether a lack of good faith was grounds for dismissal in the first place (Zick predates BAPCPA and its explicit addition of that ground for dismissal into the Code), and (2) whether the factors the bankruptcy court chose to consider, and its weighing of them, amounted to an abuse of discretion. The bankruptcy court in that case had considered a list of factors consistent with an objective standard of good faith:

> [T]he [bankruptcy] court based its decision on (1) the debtor's manipulations which reduced the creditors in this case to one; (2) the debtor's failure to make significant lifestyle adjustments or efforts to repay; (3) the fact that the petition was filed clearly in response to IIS' obtaining a mediation award; and (4) the unfairness of the debtor's use of Chapter 7 under the facts in this case.

Zick at 1128. The appellate court held that it was appropriate for the bankruptcy court to consider these factors and that its weighing of those factors was sufficient to support its findings, and therefore not an abuse of discretion. The appellate court did not, however, endorse this list of factors as exhaustive (in fact, in adopting the open-ended language of Bingham, it did quite the opposite), nor hold that the bankruptcy court in that case had been required to restrain its inquiry to objective factors. It merely held that the bankruptcy court did not abuse its discretion in relying on those factors to dismiss the case for lack of good faith. The fact that those factors happened to be objective thus appears to be primarily an artifact of the facts of that case, not of the law of this circuit. This is reinforced by the Zick court's citation of Bingham, and also of In re Brown, 88 B.R. 280 (Bankr. D. Haw. 1988), in which the bankruptcy court predicated a dismissal for lack of good faith on both objective factors (a single creditor, a debtor capable of earning substantial income, and an ability to repay) and a subjective one (the intention of abusing the Code).

Zick also makes clear, however, that while bankruptcy courts may face few constraints regarding what factors they may consider as evidence of bad faith, they should nevertheless be cautious in concluding that it is in fact present, and that dismissal is therefore warranted. "Dismissal based on lack of good faith . . . should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." Zick at 1129. The standard is thus a flexible one, but a high one.

UST argues in its brief that this case was filed in bad faith because this case was not prompted by "sudden illness, calamity, disability, or unemployment." (Pl.'s Br. at para. 12.) In addition, UST argues, Debtor recklessly gambled with other people's money, taking the risk that she would lose, and would therefore have to pay back the debts so incurred. UST

4

argues that "[Debtor] now indicates that her creditors should bare [sic] the brunt of her bad choices, while she enjoys the benefits of a 'fresh start' reserved for honest but unfortunate debtors." Id.

However, the facts as presented at trial do not support a finding of bad faith. Indeed, most of the facts that UST alleges in its brief would not be sufficient to support such a finding even were all proven true. Debtor conceded at trial that her case was not a result of sudden illness, calamity, disability, or unemployment. She did incur gambling debts which she could not reasonably afford to repay. She is now trying to obtain shelter from those creditors via a Chapter 7 discharge. Even given these facts, however, there is still insufficient evidence to support a finding of bad faith on Debtor's part. As such, Debtor's *ability* to repay her debts is only relevant insofar as it bears indirectly on the actual material fact in issue: whether Debtor *intended* to repay her debts. The Sixth Circuit has held that "the representation made by the cardholder in a credit card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay." Rembert v. AT & T Universal Card Svcs., Inc. (In re Rembert), 141 F.3d 277 (6th Cir. 1998) (internal citation omitted). Rembert involved a nondischargeability action under 11 U.S.C. § 523(a)(2)(A), in which the Sixth Circuit adopted the reasoning of the Ninth Circuit in Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280 (9th Cir 1996). Quoting extensively from Anastas, the Sixth Circuit elaborated thus:

> the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt.

Rembert at 281 (quoting Anastas at 1285-86). The reasoning of the Sixth Circuit in Rembert is directed to the legal characterization of credit card transactions–they represent "an actual or implied intent to repay the debt," id. at 281–meaning that it is irrelevant that Rembert was filed under 11 U.S.C. § 523(a)(2)(A) while the instant motion is brought under 11 U.S.C. § 707(b).

Debtor intended to pay the credit card debts she was accruing. She was extraordinarily careless in allowing them to accumulate to such sums in such a short period of time, but nothing presented in the parties' briefs or at the hearing suggests that she was deliberately incurring debts with the intention of using Chapter 7 to escape them. This point is undergirded by Debtor's testimony of an epiphany when she realized what she had done. The testimony was believable, but more importantly, the fact that Debtor's conduct immediately changed is profound evidence of Debtor's state of mind before and after this

5

moment. The changed conduct undergirds the existence of an epiphany, leading one to an inescapable conclusion: the testimony is true. The Court can also discern no other facts on this record tending to suggest "concealed or misrepresented assets and/or sources of income, and excessive *and continued* expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." See Zick, 931 F.2d at 1129 (emphasis added).

A fool, but an honest fool, Debtor remains.[1]

## B. Totality of the Circumstances Indicating Abuse

The Code also provides, separately, that a bankruptcy court may dismiss a Chapter 7 case if "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C § 707(b)(3)(B). The Sixth Circuit uses a disjunctive test to evaluate the totality of a debtor's circumstances: "[S]ubstantial abuse can be predicated upon either lack of honesty or want of need." Behlke v. Eisen (In re Behlke), 358 F.3d 429, 434 (6th Cir. 2004). In its motion, UST relies on the "lack of honesty" element of this disjunction. UST appropriately cites In re Krohn, 886 F.2d 123 (6th Cir. 1989), for the proposition that "[t]he goals of bankruptcy are to provide an honest debtor with a fresh start and to provide an equitable distribution to creditors." Id. at 127-28. UST also cites a contrast between this honest debtor and an archetypical dishonest debtor's case, a case in which "there is no evidence of an unforeseen calamity, be it economic and/or medical, whereby the debtor is involuntarily forced to seek chapter 7 relief. On the contrary, the evidence indicates that the debtor is merely using the chapter 7 provisions to gain relief from past excesses." In re Krohn, 78 B.R. 829, 833 (Bankr. N.D. Ohio 1987). (UST cites this as coming from the Circuit opinion; the passage is actually from the bankruptcy court opinion in the same case.) The Sixth Circuit decision in Krohn also provides:

> It is not possible, of course, to list all the factors that may be relevant to ascertaining a debtor's honesty. Counted among them, however, would surely be the debtor's good faith and candor in filing schedules and other documents, whether he has engaged in "eve of bankruptcy purchases," and whether he was forced into Chapter 7 by unforeseen or catastrophic events.

Id. at 126. The last of the enumerated factors parallels the example given by the bankruptcy court in that case–one who seeks to gain relief from past excesses is not forced into Chapter 7 by unforeseen or catastrophic events–but the appellate court's language also makes it clear that this factor is only one of many–one circumstance in the "totality of the circumstances . . . of the debtor's financial situation." The Sixth's Circuit's language is that of a multi-factor

---

[1] See J. R. R. Tolkien, The Two Towers 579 (Houghton Mifflin 2003) (1954) ("A fool, but an honest fool, you remain, Peregrin Took.")

6

balancing test, not a simple disjunctive rule. Factors in such multi-factor tests do not exist in isolation, and the presence of one factor tending one way may be negated by the presence of other factors tending the other.

This does not mean that the test is groundless mush. It means that, while the test is not akin to one piece of litmus paper, neither is it akin to seven pieces of litmus paper with a "majority rules" standard. Rather, each element must be considered in relation to the presence or absence of the other elements. In this sense, it is more like the diagnosis made by a medical clinician. The clinician may run identical tests in disparate cases. The presence of one particular element or fact may be dispositive proof of disease in one instance and irrelevant in another. The critical role of the clinician is understanding what matters in varying circumstances.[2]

The other factors listed in Krohn are in Debtor's favor here. She did not engage in profligate eve-of-bankruptcy purchases. She ceased gambling at some point in November of 2006 and did not file for bankruptcy until May 21, 2007. The other consumer debts listed on her schedules are unremarkable. Many of the largest sums appear to be the result of double counting both the claims of the credit card companies and the claims of collection agencies. (She does have one large student loan obligation, $44,752.83.) Likewise, there has been no evidence that she was less than candid in completing her schedules or any other component of her petition. In addition, keeping in mind the Sixth Circuit's admonition in Krohn that it is impossible to list, as a general matter, all factors that may be relevant to a debtor's honesty, the Court notes that there are additional circumstances that speak to Debtor's honesty in this case: beginning in November of 2006, Debtor began seeing a counselor, began speaking with a non-bankruptcy attorney about her finances, and made good faith efforts at getting her debts under control via a consolidation plan. As noted in Part II.A, supra, there is no evidence that, at the time she incurred the debts, she had no intention of repaying her creditors. In fact, there is every indication that she looked for ways to repay them for months after incurring them.

UST cites authority from bankruptcy courts in other circuits holding that gambling losses are to be viewed as "an excess similar to other excesses associated with living beyond one's means." In re Vianese, 192 B.R. 61, 71 (Bankr. N.D.N.Y. 1996) (quoting In re Hammer, 124 B.R. 287, 290 (Bank. C.D. Ill. 1991)). The Court does not take exception to this principle; the Court need not find that Debtor was living completely within her means in order to hold that the totality of her circumstances nevertheless does not indicate that her relationship with her creditors was dishonest. Debtor was clearly living beyond her means. However, if this alone were sufficient to indicate such dishonesty with one's creditors as to

---

[2] See Arthur S. Elstein & Alan Schwarz, Clinical Problem Solving and Diagnostic Decision Making: Selective Review of the Cognitive Literature, 324 British Medical Journal 729 (March 2002), available at http://www.bmj.com/cgi/content/full/324/7339/729.

7

warrant a dismissal for abuse, a staggering number of Chapter 7 cases would have to be dismissed as abusive. Therefore, while Debtor's accrual of debt was excessive, and this factor therefore tends in UST's favor, it is simply outweighed by other factors showing that Debtor intended to repay her debt, took steps attempting to make that intention a reality, and only filed for bankruptcy as a last resort, after non-bankruptcy alternatives failed her.

### III. Enforceability of Gambling Debts

The Court raises this issue *sua sponte*; neither party briefed it and no factfinding on it was developed through discovery or trial. Nevertheless, the Court feels compelled to address the issue because it raises threshold questions that should have been addressed before reaching the issues of bad faith and dishonesty with creditors.

The Court is not convinced that the gambling debts at issue in this case were valid in the first place. Void or unenforceable debts cannot legally form the basis of a motion to dismiss for abuse of Chapter 7.

Gambling debts have long been unenforceable under Ohio law and, since October 13, 2006, online credit card payments to persons engaged in the business of betting or wagering have been illegal under federal law.

#### A. State Law

Contracts in support of gambling debts are void under Ohio Rev. Code § 3763.01, which provides:

> All promises, agreements, notes, bills, bonds, or other contracts, mortgages, or other securities, when the whole or part of the consideration thereof is for money or other valuable thing won or lost, laid, staked, or betted at or upon a game of any kind, or upon a horse race or cockfights, sport or pastime, or on a wager, or for the repayment of money lent or advanced at the time of a game, play, or wager, for the purpose of being laid, betted, staked, or wagered, are void.

Ohio Rev. Code § 3763.01(A). There is then an exception in Ohio Rev. Code § 3763.01(B), which provides, *inter alia*, that the voiding provision shall not apply to games of chance not subject to criminal penalties under Ohio Rev. Code § 2915.02.

Ohio Rev. Code § 2915.02 defines the offense of gambling under Ohio law, providing *inter alia* that no person shall "establish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance," Ohio Rev. Code § 2915.02(A)(2). Another subsection of that section classifies gambling as a first

8

degree misdemeanor for a first offense and a fifth degree felony for subsequent offenses. Ohio Rev. Code § 2915.02(F). The section does not prohibit gambling expressly permitted by law, Ohio Rev. Code § 2915.02(C), and contains a broad exception for many forms of gambling for the benefit of charitable organizations. Ohio Rev. Code § 2915.02(D). This latter exception is clearly inapplicable here; Ms. Baum was not gambling at charity functions. The Court cannot establish that any of the gambling sites at which Ms. Baum incurred the debts underlying the UST's motion to dismiss qualify as gambling "expressly permitted by law," and the Court has found nothing in Ohio statutes to indicate such express permission for any online gambling site.

The fact that Debtor's gambling transactions were made via the internet does raise a choice of law issue, since the Court is certain that Debtor at some point indicated acquiescence to language that would have these transactions governed by the laws of another forum than Ohio. The Court is confident that no gambling site would choose to have its contracts governed by the laws of a forum in which gambling contracts are void. However, the Court need not find such a provision dispositive. In at least one recent case, the Bankruptcy Court for the Western District of Wisconsin held that Wisconsin law, not Nevada or New Jersey law (as had been specified in the contracts between the parties), would govern the enforceability of gambling debts accrued in a debtor's unsuccessful gambling efforts in Las Vegas and the Bahamas. In re Jafari, 378 B.R. 575 (Bankr. W.D. Wis. 2007). The Jafari court stated the Wisconsin rule that "the parties to a contract may expressly agree that the law of a particular jurisdiction will control their relationship, but they cannot do so 'at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded.'" Id. at 590. Ohio's rule for when the laws of other states will be preempted by public policy concerns of the state of Ohio is similar; Ohio follows the Restatement (Second) of Conflict of Laws § 187(2) (1971), which provides in part:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 438 (1983).

The issue thus arises whether Debtor's gambling transactions would be subject to Ohio law under § 187(2)(b). That gambling is against the fundamental policy of Ohio can be fairly easily ascertained; whatever a state criminalizes is against the public policy of that state.

The remaining issues are thus whether Ohio has a "materially greater interest than the chosen state," whatever state that might be, and whether under Restatement (Second) of Conflict of Laws § 188 (1971), Ohio's law would apply absent such a contrary provision. Ohio's interest in the transaction is greater than any other state's. Running a gambling operation is either a first-degree misdemeanor or a fifth-degree felony in Ohio, and gambling contracts are considered legally void in this state; these are not minor sanctions, and they speak to the strength of the state's interest in the activity. Ohio, like Wisconsin, "has a long-standing public policy against witnessing its citizens plunge headlong into debt by gambling on credit." Jafari at 591. In addition to its interest in the activity, the state has a materially greater interest in at least one of the parties than any other state: Debtor is a citizen of Ohio, and never left the state in search of gambling opportunities; they came to her, via the internet. The interests of Ohio and a foreign state in the online casinos themselves are a relative draw; their home state has an interest in the revenue that their business brings in, but Ohio has an interest in their conduct when they reach into Ohio to solicit business.

Section 188 requires the Court to compare the relative weight of five kinds of "contacts" (factual issues pertinent to the transaction) against an even longer list of "principles" (for determining the applicable rule of law), which are set forth in Restatement (Second) of Conflict of Laws § 6 (1971). The contacts a court is to take into account, paying attention to their relative importance, include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2) (1971). The legal resolution of the issue then turns on balancing the following factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

The same concerns that motivated the Jafari court to find that Wisconsin law would otherwise apply to the gambling transactions in that case apply *a fortiori* here. With respect

10

to the § 188 contacts, the debtor in <u>Jafari</u> at least actually left the state to gamble, and that court still held Wisconsin to have the preponderance of contacts with the transaction by weight. By contrast, all of Debtor's contacts with all of the gambling sites she visited were situated at least partially in Ohio. With respect to the § 6 principles, Wisconsin does not follow all of them, but has essentially adopted (a), (b), (f), and (g), along with the principle of "application of the better rule of law." <u>Heath v. Zellmer</u>, 35 Wis.2d 578 (Wis. 1967). The <u>Jafari</u> court found that all five factors weighed in favor of employing Wisconsin law, and the same logic that lead to that conclusion in that case would lead equally to the same conclusion here with respect to the four factors that Wisconsin and Ohio have in common.

### B. Federal Law

In addition to state law enforceability issues, this case raises issue of federal law, given the passage of the Unlawful Internet Gambling Enforcement Act (UIGEA) of 2006, 31 U.S.C. §§ 5361-5367 (effective October 13, 2006). UIGEA prohibits the acceptance of most financial instruments, including credit cards, for "unlawful Internet gambling." 31 U.S.C. § 5363(1). "Unlawful Internet gambling," in turn, is defined as using the internet to place or receive a bet or wager where doing so would be unlawful "under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10).

UIGEA does not provide for private enforcement even of its provision for civil remedies. 31 U.S.C. § 5365. However, that does not compel the conclusion that a restricted transaction that has come before a court must be treated as valid until a government attorney appears to challenge it. Section 5365(a) provides: "In addition to any other remedy under current law, the district courts of the United States shall have original and exclusive jurisdiction to prevent and restrain restricted transactions by issuing appropriate orders in accordance with this section, regardless of whether a prosecution has been initiated under this subchapter."

### IV. Conclusion

UST has failed to meet the burden of proving that either Debtor filed her petition in bad faith or that the totality of the circumstances of her financial situation demonstrated a dishonest relationship with her creditors. The failure to do either of these is sufficient to support the denial of UST's motion to dismiss. In addition, while the state of the evidence on this point is considerably less than the Court might desire, based on the record as constructed, those debts in Debtor's petition flowing from gambling losses, particularly those incurred via electronic credit card payments after October 13, 2006, are unenforceable under Ohio (and, after October 13, 2006, federal) law.

UST's Motion to Dismiss Case for Abuse will be denied by a separate order to be entered concurrently with this opinion.

11

**Service List:**

Darlene K Baum
425 Jacobs St
Ashland, OH 44805

Anthony J. DeGirolamo, Trustee
Canton
Courtyard Centre, Suite 625
116 Cleveland Ave., N.W.
Canton, OH 44702

Scott R. Belhorn ust35
Office of the US Trustee
Howard M. Metzenbaum U.S. Courthouse
201 Superior Avenue East
Suite 441
Cleveland, OH 44114-1240

Sara E Polony
Rauser and Associates
401 West Tuscarawas Ave, #400
Canton, OH 44702